ARCH SELLERY, INC., a Wyoming corpo-
ration, and Lierd and Miracle, a co-part-
nership, Appellants (Defendants below),

v.

Curt SIMPSON, doing business as Natrona
Roofing Company, Appellee
(Plaintiff below).

No. 2898.

Supreme Court of Wyoming.

Nov. 24, 1959.

Houston G. Williams, Mahoney, Murphy
& Emery, and Robert A. Burgess, Casper,
for appellants.

Harry E. Leimback, Casper, for appel-
lee.

Before BLUME, C. J., and PARKER
and HARNSBERGER, JJ.

Mr. Justice PARKER delivered the opin-
ion of the court.

Plaintiff sued to foreclose a roofing con-
tract lien filed May 8, 1957, and containing
an allegation that the indebtedness accrued
on March 29, 1957. The district court ad-
judged the lien to be proper and plaintiff
entitled to foreclose. Defendants have ap-
pealed, urging that the judgment is not sup-
ported by the evidence and is contrary to
law—the principal contention being that
the roofing job was substantially completed
on October 31, 1956, long prior to the
ninety-day period following the accrual of
indebtedness allowed for the filing of a
lien statement under the provisions of § 55–
205, W.C.S.1945, now § 29–11, W.S.1957.

The following facts related by plaintiff
are not in substantial dispute:

Simpson took a subcontract from de-
fendant corporation, Arch Sellery, a
builder, now bankrupt, to roof a struc-
ture later known as the Shell Building
on land belonging to defendants Lierd
and Miracle. The subcontract was let
in August 1956. The roofing work,
which took about a week, was com-
pleted on October 31 with the excep-
tion of the sealing of the gravel stop [1]
which was placed around the circum-
ference of the roof after the roof had
been laid. This sealing, costing about
thirty dollars, was a relatively small
amount in comparison with the contract
price of the roofing, $4,099.50. Some-
times the gravel stop is installed before
the roof is laid, but in the instant case
the sheet metal workers had not yet
made the installation when the roofing
work was finished. Simpson completed

1. The gravel stop is a counterflashing around the roof to keep the gravel from rolling
off.

the laying of the roof on the last of October, billed Sellery for the full amount of the job, and was paid $2,049.75, one-half of the sum, on November 13. On December 10, one May who had taken over the roofing business from Simpson gave Sellery a ten-year guarantee on the roof. Simpson watched the building to see when the gravel stop was installed and saw that it was done about January 1. Between then and March 29 weather conditions were not such that he could do the sealing. On March 29 Lierd called Simpson and said his "building was leaking on the west wall." Simpson took for granted that the reference was to the Shell Building; and on that day, March 29, he and his successor May went onto the roof with a five gallon bucket of plastic, troweled around the scuppers—working for something less than an hour and using about a gallon of plastic, encountered water which prevented further sealing, and stopped. May agreed that for the sum of twenty-five dollars he would finish the sealing, but he never actually did it. A few days or a week later Simpson talked on the phone to Lierd who said then that he had not meant the Shell Building in his previous conversation, but had referred to his house on Casper Mountain, and indicated that he did not want Simpson to do anything further on the Shell Building. About three weeks later Simpson again talked on the phone with Lierd who said that the job was completed as far as Simpson was concerned because the owners had called one Pancratz, a roofer, to do the work.

The only variance from the above account of the occurrences was the testimony of Lierd who said that there were several telephone calls between him and Simpson in the winter of 1956 and the spring of 1957 with regard to a leak on the overhang of the roof of his home, that they talked about the Shell Building one day in the course of these calls, and that Simpson apparently knew the condition that had developed there, having given Lierd the impression that the leak was probably the fault of the tinner. He said he did not remember when the conversations about the Shell Building took place. He also said that he had discovered the leak in the Shell Building himself on March 25 and had called the general contractor to have him do something about it. He told of one other conversation in the late spring or early summer of 1957 when Simpson called about the bill not being paid. Defendants' testimony also showed that the building was occupied sometime in November 1956, that the tenant began to pay rent on December 15, and that Sellery submitted a final bill for the building and by December 17, 1956, was paid in full by the owners.

▉ Bearing these facts in mind, we examine the pertinent statutes and cases interpreting them to determine the propriety of the judgment in the instant situation. Section 55–201, W.C.S.1945, now § 29–4, W.S.1957,[2] allows a lien to those making the improvement or repair "by virtue of any contract with the owner or proprietor"; and § 55–205, W.C.S.1945, now § 29–11, W.S.1957, refers to "contractor" and "subcontractor." In Big Horn Lumber Co. v. Davis, 14 Wyo. 455, 84 P. 900, 85 P. 1048, 7 Ann.Cas. 940, Judge Potter discussed at some length the necessity of the existence of a contract to authorize the filing of a lien under the statute, indicating that such contract may be either express or implied.[3] He cited General Fire Extinguisher Co. v. Schwartz Bros. Commission Co., 165 Mo. 171, 65 S.W. 318, which held that when a building is substantially complete and is accepted by the owner the contractor can-

---

2. Similar to Section 429.010, Mo.Rev. Stats.1949, V.A.M.S.

3. Cases holding contracts to be essential as a basis for liens include Riverside Lumber Co. v. Schmidt, 130 Mo.App. 227, 109 S.W. 71; Badger Lumber Co. v. Stepp, 157 Mo. 366, 57 S.W. 1059.

not thereafter at his own instance perform some omitted part of the contract and thereby extend the period for filing the lien.[4] It is clear that in order that the lien in the instant case be valid it must have been based upon the contract and not be some act omitted or neglected to be performed at the time the original work was done.

Giving the evidence every inference which would be favorable to the successful party, we are unable to say that the indebtedness to the roofing subcontractor accrued later than early November 1956. Simpson rendered his bill about November 1, 1956, and this fact without more would seem to reasonably imply that the work was then complete. If work is not complete, the person rendering the bill would seem to be obligated to so indicate in some way. Were the work only partially completed, it would seem that the natural thing to do would have been to note the items which were not complete. It may, of course, be argued that Sellery's payment of only one-half of the bill on November 13 tended to counteract any understanding that the work had been completed prior to that time, but such argument would be without much force since it is common that completed work is not all paid for immediately. In any event, a tenant began to occupy the property about November 15, paying the first month's rent on December 15. By December 17, the owners had paid in full for the contract, including the roofing. Meanwhile, on December 12, Simpson caused a ten-year guarantee of the roof to be issued. Perhaps no one such occurrence considered alone would be determinative, but all considered together would seem to show that by the understanding of the parties the building was complete. Even if we should give no weight to the various happenings which we have just mentioned, it would still be necessary to the validity of the lien that the date of the accrual of the indebtedness be based upon the contract between the parties. Plaintiff in his petition says he furnished the labor and material pur-

suant to an oral contract with the defendants. At the trial Simpson mentioned the contract but made no point of its being an oral agreement and recited none of the details of it. Defendants introduced the subcontractor's agreement signed by Simpson and Sellery. There was no objection from plaintiff. That agreement was a Ditto form, apparently applicable to all subcontractors and having no especial relation to Simpson except for the title "Roofing and Waterproofing" and the contract price "$4,099.50" which were typed. It provided in effect that the roofer would perform the work outlined and indicated in the plans and specifications—which were not before the court. This presented an anomaly: The lien was based upon a written contract, the important part of which was not in evidence. There was some testimony regarding both the necessity and the practice of sealing gravel stops, but any such testimony could not by any reasonable adherence to the parol evidence rule vary the terms of a written contract or prove a parol, contemporaneous agreement at variance with the writing. Cary v. Manfull, 41 Wyo. 476, 287 P. 433. The inspecting engineer testified:

"Q. Mr. Volk, in your experience with building, is it necessary in a completed roof to seal off the gravel stops and scuppers? * * * A. Yes, I would say so.

"Q. And that would be necessary before a completed roof? A. Yes."

The roofer, Pancratz, said:

"Q. Is it normal in your trade and profession to seal the gravel stops? A. Well, this type of gravel stop normally we wouldn't.

"Q. But you did in this case? A. We did in this case."

Simpson said:

"Q. Well, now, the sealing that you require, would you tell the Court whether or not that was necessary for

4. In the interpretation of the Wyoming lien laws, this court has considered the decisions of Missouri, the jurisdiction of the law of origin, to be persuasive.

the completion of your roof? A. Well, for a rubberoid bonded roof it is absolutely necessary. It would have to be for the roof to be complete."

It might be contended that the portion of this testimony favorable to plaintiff must stand. Hausen v. Goldman, 124 Cal.App. 2d 25, 267 P.2d 852, 855, holds:

"* * * Where no objection is made to the admission of secondary evidence for the purpose of proving the terms of an agreement, there is no error in the trial court's consideration of such evidence. * * *"

Even if we should accept the most favorable portions of the quoted testimony, there would still be no showing that the sealing was a part of the original contract; and unless it was, there could be no filing of a lien.

We have carefully considered the versions of the conversation between plaintiff and Lierd, one of the owners of the building, purported to have occurred on March 29. Simpson said:

"* * * Mr. Lierd called and said his building was leaking on the west wall. Well, I took it for granted it was the Shell Building, and I went down there, and sure enough it was a-leaking on the west wall bad. And then I called him back later on, and he said he was talking about his house up on the mountain."

Lierd said that in the March 29 discussion over the phone he told of a leak in the overhang of his home, and he denied having discussed the roof of the Shell Building with Simpson until well into late spring or early summer of 1957. That conversation seems reasonably to reflect a complaint as to the quality of the work rather than a request to perform an uncompleted contract.

Since mechanics' liens are not recognized at common law but are in derogation thereof and not allowed in equity independently of statute,[5] there must be a full compliance with the requirements which the legislature has established. In the instant case, there could be no lien unless the sealing was accomplished pursuant to the contract; and there was no evidence that the sealing was a part of the contract unless we accept the testimony of necessity and practice—which we are loath to do. Since the trial court undoubtedly did this, we have no alternative but to reverse the case. We think, however, that the introduction of further evidence, especially the plans and specifications, might well clarify the matter; and in the interest of equity we remand the cause for further proceedings not inconsistent with the views herein expressed.

Reversed and remanded with directions.

---

5. 36 Am.Jur. Mechanics' Liens § 3; 57 C.J.S. Mechanics' Liens § 1.